Filed 12/22/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KEITH TURLEY et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>FAMILIAN CORPORATION,<br><br>    Defendant and Respondent. | A149752<br><br>(Alameda County<br>Super. Ct. No. RG15762202) |

Plaintiffs husband and wife sued for asbestos-related injury against numerous defendants, including defendant Familian Corporation.  Familian moved for summary judgment on the basis that plaintiffs could not show exposure to asbestos in a Familian-related product. Plaintiffs' opposition included a declaration from a third party witness who had not been deposed, who testified in detail to such exposure.  The trial court then continued the motion, allowed the witness to be deposed, and Familian then used portions of the deposition in support of its reply.  The trial court thereafter concluded that the deposition testimony "conclusively negates" the witness's declaration testimony as to exposure; refused to consider it under the principle set forth in *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 (*D'Amico*); and granted summary judgment.  We conclude the trial court erred, and we reverse.

**BACKGROUND**

**The Complaint and the Discovery**

Plaintiffs Keith Turley (Turley) and his wife Joy Ann Turley (when referred to collectively, plaintiffs or the Turleys) filed a complaint on March 13, 2015 against some 50 defendants.  The complaint alleged six causes of action, on the fundamental basis that Turley has asbestos-related disease caused by exposure to asbestos-containing products,

1

including valve gaskets, during his 36-year employment at Pacific Gas and Electric Company (PG&E).

Familian was not named in the original complaint, but was served as a Doe defendant, and on July 15, 2015 filed its answer.

Both plaintiffs and Familian accuse the other of various sharp discovery practices.[1] We will not wade in on this, as we do not deem it germane to the issue before us, which is whether the summary judgment was proper.

As to the discovery that did occur pertinent to the issue here, it began with Familian serving " 'state all facts' " interrogatories on plaintiffs. Plaintiffs' response stated that Turley was exposed to asbestos-containing pipe products supplied by Familian, including "asbestos cement transite pipe, pipe collars, gaskets, elbows, pipe-repair products and other asbestos products."

As to the locations where Familian supplied such products, plaintiffs identified the Kettleman City compressor plant in Avenal, pipelines in Burney, and pipelines in Bakersfield. Their response did not identify the Willows district compressor station.

As to the documents supporting their position, the Turleys referred to depositions and other documents, some 11,000 pages in all, including the following: (1) Turley's medical records; (2) eight depositions, of Turley, Mrs. Turley, Keith Appleton, Glen Moon, Gary Mason, Paul Scott, Gail Reed, and Harvey Suddy; (3) unidentified business records; (4) Familian's responses to general order standard interrogatories; (5) a list of depositions by Familian's former and/or present corporate witnesses in other cases

---

[1] Familian's respondent's brief asserts that plaintiffs "should not be allowed to profit from their wrongdoing," as the "record in this case demonstrates a remarkable pattern of discovery obstruction by" plaintiffs. Plaintiffs take issue with Familian's description, accusing Familian of "misrepresent[ing]" a trial court order, and also of improperly relying on the claimed discovery-related issues, asserting that "the constant refrain running through all of the arguments asserted by Familian is that summary judgment was properly granted because plaintiffs' counsel failed to cooperate in Familian's efforts to obtain Paul Scott's deposition."

2

involving Familian; (6) contents of Familian's job files, invoices, supply logs, transfer transactions and sales receipts; and (7) a list of various medical and scientific articles.

Asked to identify witnesses with knowledge of Turley's claimed exposure to products " 'manufactured/supplied' " by Familian, plaintiffs named eight people: themselves, Mason, Appleton, Moon, Suddy, Reed, and Scott.[2]

At a case management conference in November, 2015, the case was set for trial for September 6, 2016.

Against that background, Familian filed the motion leading to the appeal here.

**The Motion for Summary Judgment**

On June 24, 2016, Familian filed a motion for summary judgment or, in the alternative, summary adjudication. It was set for hearing on August 26, and thus plaintiffs' opposition was due on August 12. The essential argument as to all causes of action was that plaintiffs could not establish that Turley was exposed to asbestos from any Familian-related product or that Familian caused his alleged asbestos-related disease. As Familian itself describes it: "In its motion, Familian used deposition testimony to establish that [plaintiffs] have no evidence that Turley was exposed to asbestos in a product manufactured, supplied, sold, or distributed by Familian. Familian also used [plaintiffs'] factually devoid discovery responses to establish that [plaintiffs] cannot support their allegations of exposure and cannot obtain such information."

To put it otherwise, Familian's motion was not based on affirmative evidence. For example, there was no declaration from any Familian representative or person most knowledgeable testifying that Familian did not sell asbestos-containing gaskets. And no testimony that even if it did, it never sold any such materials to PG&E during the time that Turley worked there, or it did not supply such materials to the district where Turley worked. As the Turleys describe it, "all that Familian did was submit plaintiffs' discovery responses and snippets from the depositions of only *some, but not all*, of the

_____

[2] Plaintiffs' discovery responses represented that all witnesses were represented by their counsel of record (Keller, Fishback & Jackson) and could be contacted only through counsel.

witnesses identified in plaintiffs' discovery responses. In fact, although the plaintiffs' interrogatory responses identified defendants' own persons most qualified and corporate representatives, no deposition transcripts of those identified witnesses were attached to the motion to show that Familian did not supply those materials."

A week after it filed its motion, Familian moved to vacate or continue the September 6 trial date, based on the claim that plaintiffs had obstructed Familian's effort to take the deposition of Scott. The motion was heard on July 29, at which the court ordered the parties to meet and confer and to produce Scott for deposition by August 19.[3] This, of course, was after the August 12 due date of plaintiffs' opposition to the motion.

Plaintiffs filed their opposition on August 12, which among other things included copies of their supplemental responses to interrogatories. Most pertinent to the issue here, plaintiffs' opposition included the declaration of Scott, in which he testified in pertinent part that he was an apprentice mechanic and warehouseman who worked with Turley for some six years, from 1981–1987; that he was the person responsible for ordering and distributing materials in the Willows district; and that on "many occasions" the replacement gaskets that Turley was exposed to while working in the Willows district for PG&E in the 1980's were asbestos-containing—and supplied by Familian. Scott also testified he personally observed Turley replacing asbestos-containing gaskets in valves at PG&E's compressor stations, and on "many occasions" personally observed Turley in the immediate vicinity of other mechanics replacing asbestos-containing valves at those stations.

Following the trial court's order, Scott was in fact deposed for two days, on August 16 and 17. There, Familian would come to contend, Scott "contradicted many of

---

[3] The order provided in pertinent part as follows: "Familian's Motion to continue or vacate trial date is denied, but the discovery cut-off is extended to August 19, 2016 for the sole purpose of taking the Scott deposition. Parties to meet and confer as to date of deposition but the defendant must serve the witness with a subpoena unless there is an express agreement by plaintiffs' counsel to produce the witness."

the factual and foundational statements made in his declaration," which thus became the basis of Familian's reply.

Familian filed its reply papers on August 19, 401 pages of reply to be precise. The reply included the "[r]ough," that is, uncertified, copy of Scott's deposition. The reply also included objections to evidence, including specific objections to Scott's declaration, on the grounds it was produced after the close of discovery; that the Turleys had blocked Familian's efforts to depose him; and that Scott lacked foundation to identify products that Turley worked with or around as products supplied by Familian.

In response to that reply, plaintiffs objected to Familian's submission of the rough transcript on two bases: (1) pages from an uncertified transcript are inadmissible, and (2) submission of additional evidence in a reply on summary judgment violates due process.

The court held an initial hearing on the motion on August 26, and took the matter under submission. Then, by subsequent order the court permitted Familian to submit certified copies of Scott's deposition transcript, which Familian did, on August 31.

Plaintiffs again objected to the supplemental evidence on the grounds it was untimely and violated their due process rights. At the same time, plaintiffs took issue with Familian's position that Scott's deposition contradicted his declaration. Doing so, plaintiffs pointed to various portions of his deposition testimony, including where Scott testified that he: (1) ordered, received, and distributed to the mechanics in the Willows district where Turley worked "a lot" of Familian asbestos-containing gaskets during 1983–1987; (2) knew that the gaskets he ordered from Familian were asbestos-containing because of the code numbers and labeling in the requisition requests, purchase orders, packing slips, and invoices relating to those products; (3) knew which gaskets he ordered, and received, from Familian were asbestos-containing, because he knew the applications they were used for, (i.e., the valves in the high-pressure and/or high-temperature systems required the use of asbestos-containing gaskets); (4) knew that he had to be careful to sort out the asbestos-containing gaskets from non-asbestos gaskets correctly, because using non-asbestos gaskets in the high-temperature or high-pressure valves was dangerous;

5

(5) knew the asbestos-containing gaskets came from Familian because he personally ordered them from Familian, and Familian's name appeared on the packing slips and the invoices; (6) personally witnessed Turley in the immediate vicinity of other mechanics replacing asbestos-containing gaskets on high-pressure and/or high-heat valves with Familian-supplied asbestos-containing gaskets many times through the years; and (7) personally knew that Turley was frequently in the field supervising valve maintenance, including the replacement of asbestos-containing gaskets, including those supplied by Familian.

Plaintiffs also submitted specific portions of Scott's deposition, which they claimed "affirmed the statements in his declaration, clarified those statements and provided further foundation for them." Such portions included, for example, Scott's response when asked how it was that he could testify about the use of asbestos-containing gaskets supplied by Familian during 1983 to 1987 at the compressor stations where Turley was exposed, where he said, "When, as I've stated and testified before, when those products came in, it was my job to know that that was the right product. It had tags on it, the packing slip. And on that packing slip, it listed the material, what it was. It also had the vendor name on it and Familian's name was on those packing slips." In short, that it was his job to know who supplied the materials that the mechanics used.

Similarly, when asked how he could testify, without speculating, that Turley was in "the presence of other mechanics working with asbestos gaskets or packing supplied by Familian," Scott testified he "observed Mr. Turley in close proximity to different mechanics while working on these gaskets, taking them off and putting them on." And, he added, "I was a natural gas transmission mechanic, journeyman, and an apprentice. I actually used those gaskets myself. I was with those mechanics when they actually went into the warehouse, pulled a gasket out and used it on the job. I had personal knowledge and personal vision, if you will, of them doing this." Indeed, Scott confirmed that "I've even seen Mr. Turley go in, pull a gasket and bring it out to the mechanic, mainly because he messed the gasket up going back together and he said, I'll go and get it for you right quick."

6

The trial court held a second hearing on September 9. And on September 15, the trial court entered an 10-page order granting summary judgment. The order began with a lengthy discussion concluding that Familian had shifted the burden by its submission of the Turleys' discovery responses. The order then discussed for three pages Scott's declaration, finding that Scott's "declaration, standing alone, establishes a sufficient basis to find personal knowledge." It overruled plaintiffs' objection to Scott's deposition. And then the order reached the conclusion critical here: that Scott's testimony "conclusively negates his declaration's statements that Familian supplied asbestos laden gaskets and packing that plaintiff Turley was exposed to." The order ended with these three paragraphs:

"Indeed, the deposition demonstrates that, contrary to his declaration, Mr. Scott can only speculate as to whether any particular gasket or packing material Mr. Turley was exposed to, was supplied by Familian or that any said gasket or packing material contained asbestos. See Scott deposition (Familian was not sole source of gaskets); (unknown what model, size or specification of Familian gaskets); (would have to speculate to say if any particular occasion Turley exposed to Familian gasket); (not trained to identify asbestos containing gaskets, only knew from code used by PG&E); (PG&E used both asbestos and non-asbestos containing gaskets); (would have to speculate if gasket from Familian contained asbestos); (unknown who manufactured products supplied by Familian); (unknown what application Familian supplied valves used for); (unknown what specifications for valves from Familian); (not all packing had asbestos); (only basis for knowledge of asbestos is PG&E codes and vendor numbers).

"While plaintiffs' counsel attempted to rehabilitate Scott at his deposition, his general statement that he continued to endorse his declaration, or that at some unspecified time he saw Turley working with Familian gaskets and packing, does not establish either personal knowledge or remove the speculativeness of his testimony. In short, Scott's testimony establishes that he cannot offer admissible evidence that creates an issue of fact as to whether Familian actually supplied asbestos containing products that Turley was exposed to.

7

"Statements made in a deposition govern and prevail over contrary declarations. *Visueta v. General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1613.  The credibility of such testimony is valued 'so highly' that affidavits to the contrary may be disregarded. *Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1521.  While this rule may not apply where the deposition testimony is 'fragmentary' or 'equivocal,' or where there is other evidence in the record that creates an issue of fact, *Scalf* at 1523-[1524], in this case, the testimony, oft repeated, is clear and there is no other evidence in the record that indicates Familian supplied any asbestos containing products that plaintiff Turley was exposed to."[4]

The trial court subsequently entered judgment for Familian, from which plaintiffs appealed.

## DISCUSSION

### The Standard of Review

The parties disagree as to the standard of review.  Plaintiffs assert that the "primary standard of review . . . here is the *de novo* standard applicable to summary judgment motions."  Familian asserts that the issues raised by plaintiffs involve two rulings by the court on evidentiary objections which, they claim, are reviewed for abuse of discretion.  Familian's position is based on the claim that plaintiffs' appeal is "focused on two alleged errors where they believe the trial court abused its discretion: (1) allowing Familian to submit excerpts from Scott's deposition to support its argument with its reply; and, (2) disregarding the Scott's attorney drafted declaration after it found that Scott's deposition testimony conclusively negated his declaration."

The Turleys' response asserts that Familian's discussion of the standard of review "ignores the fact that the *very first discussion in the 'Legal Argument' section of the Opening Brief* demonstrates that Paul Scott's deposition testimony *itself* was sufficient to

---

[4] The trial court also denied as moot Familian's motion for summary adjudication on three issues, false representation, intentional tort, and punitive damages.

establish the existence of triable issues of material fact, thereby requiring reversal of the summary judgment."

We agree with the Turleys.

We set forth the applicable law in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253–254: "On appeal '[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]' (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims. (*Romano v. Rockwell Internat., Inc.* [(1996)] 14 Cal.4th [479,] 487.) As we put it in *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320: '[W]e exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit.' (Accord, *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)

"But other principles guide us as well, including that '[w]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.) And we must ' "view the evidence in the light most favorable to plaintiff[] as the losing part[y]" and "liberally construe plaintiff[']s evidentiary submissions and strictly scrutinize defendant[']s own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff[']s favor." ' (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97.)"

Finally, to the extent that there is any ambiguity in the evidence, as Justice Chin colorfully put it, " 'the task of disambiguating ambiguous utterances is for trial, not for summary judgment.' " (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 541.)

There is another component to the standard of review in this case. Familian argues that we review the trial court's evidentiary rulings for abuse of discretion.

9

Plaintiffs on the other hand assert that "[a]though the standard of review for assessing a trial court's rulings on evidentiary issues is presumed to be abuse of discretion, there is academic debate on the issue of whether a trial court's evidentiary rulings *on summary judgment* should be assessed under the same de novo standard applied to all other aspects of summary judgment. Even the Supreme Court acknowledges this as an issue for debate, although it has—so far—declined to address it definitively. (*Reid v. Google, Inc.*[*, supra,*] 50 Cal.4th [at p.] 535.)" We noted this issue ourselves, in *Nazir v. United Airlines, Inc., supra*, 178 Cal.App.4th at page 255, footnote 4, and in fact, a recent case has held that such review is de novo. (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1451.)

We conclude that even if our review is for abuse of discretion, such discretion was abused here. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 [exercise of discretion is subject to the legal principles governing the subject].) The trial court was wrong, both legally and factually. We begin with the law of exposure.

### The Law of Exposure

The elements of proof in a case involving asbestos-related injury have been described by the Supreme Court as follows: "In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury." (*Rutherford v. Owens-Illinois, Inc*. (1997) 16 Cal.4th 953, 982, fn. omitted (*Rutherford*); accord, *Hernandez v. Amcord, Inc*. (2013) 215 Cal.App.4th 659, 669–673; *Lineaweaver v. Plant Insulation Co*. (1995) 31 Cal.App.4th 1409, 1415–1417 (*Lineaweaver*); see CACI No. 435.) In short, there are two elements to plaintiffs' claims: (1) "some threshold exposure," and (2) "legal cause."

While Familian argued below that plaintiffs' discovery responses were

10

factually devoid with respect to the exposure issue, it did not argue that the responses failed to establish that any exposure that did occur did not contribute to Turley's disease. Nor did it submit the declaration of any expert—doctor, toxicologist, or industrial hygienist—purporting to establish any such lack of legal causation. In short, the sole issue raised by Familian in its motion was lack of exposure.

As to exposure, *Lineaweaver*, a decision by our colleagues in Division One, is instructive. *Lineaweaver* involved three consolidated lawsuits by three separate plaintiffs: (1) a refinery worker who had worked for many years as a laborer and journeyman boilermaker/welder, (2) a shipyard laborer, and (3) a merchant marine. They sued numerous asbestos suppliers, but proceeded to trial only against Plant, an asbestos insulation contractor and supplier of Pabco. The trial court granted a nonsuit as to all three plaintiffs. (*Lineaweaver, supra*, 31 Cal.App.4th at p. 1413.) The Court of Appeal affirmed as to the laborer and the merchant marine, because neither could prove they were actually exposed to any Pabco material supplied by defendant, and there was no evidence Pabco was actually used on any of the ships on which they worked. (*Id*. at p. 1421.)

But not so as to the refinery worker, as to whom the Court of Appeal reversed. His evidence, the court held, was sufficient, citing six items of evidence, including that: "(2) Lineaweaver worked at the Standard Oil refinery from 1950 to 1984, repeatedly working with and around asbestos insulation; (3) Lineaweaver worked throughout the sprawling refinery which has insulation over about two-thirds of its pipes and much of its equipment: (4) Lineaweaver saw boxes of Pabco products at the refinery; (5) Plant was a significant supplier of asbestos products, performing about 50 percent of the insulating work at the refinery in the 1960s . . . ." (*Lineaweaver, supra*, 31 Cal.App.4th at p. 1419.)

So, the court concluded, "[w]hile there was no direct evidence that Lineaweaver was exposed to Plant-supplied Pabco, the circumstantial evidence was sufficient to support a reasonable inference of exposure. Unlike *Duman* . . . , in which we found insufficient evidence of exposure to a particular asbestos product, plaintiff has established that defendant's product was definitely at his work site and that it was sufficiently

11

prevalent to warrant an inference that plaintiff was exposed to it during his more than 30 years of working with and around asbestos throughout the refinery." (*Lineaweaver, supra*, 31 Cal.App.4th at p. 1420.) Or, as the court had earlier put it, in a discussion of the components to provide causation, "we conclude that the proper analysis is to ask whether the plaintiff has proven exposure to a defendant's product, of whatever duration, so that exposure is a possible factor in causing the disease and then to evaluate whether the exposure was a substantial factor." (*Id*. at pp. 1415–1416.)

The Supreme Court's most recent pronouncement on the issue is similar, this in *Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167 (*Webb*). There, Special Electric brokered the sale of crocidolite, an extremely hazardous asbestos product used in making a finished product. Webb, a warehouseman, sued Special Electric. A jury found for him, but the trial court granted judgment notwithstanding the verdict (JNOV). The Court of Appeal reversed, a reversal affirmed by the Supreme Court, reinstating the verdict for Webb. (*Id.* at pp. 177–179.)

The primary focus of *Webb* was the application of the sophisticated intermediary doctrine and the duties of raw asbestos suppliers to warn the ultimate consumer or user of a product. However, at the end of the opinion the Supreme Court held that Webb's evidence of exposure was sufficient. This is the language: "Special Electric contends the evidence was insufficient to show Webb was exposed to crocidolite asbestos it had supplied. The Court of Appeal rejected this argument, finding substantial evidence of exposure and causation. We too conclude this alternative ground for affirming the JNOV order lacks merit. Plaintiffs introduced evidence that Webb was exposed to dust from Johns-Manville products containing trace amounts of crocidolite at roughly the same time Special Electric was supplying crocidolite asbestos to Johns-Manville. While evidence of the link could be stronger, it is nonetheless sufficient for the jury to have found that Special Electric's asbestos was a substantial factor in causing Webb's mesothelioma. (See *Rutherford, supra,* 16 Cal.4th at pp. 976–977; *Sparks v. Owens-Illinois, Inc*. (1995) 32 Cal.App.4th 461, 476.)" (*Webb, supra*, 63 Cal.4th at p. 193, fn. 12.)

12

Likewise here: Scott's testimony established that Familian-supplied asbestos-containing gaskets were frequently used at Turley's worksite throughout the five years that Scott was the person ordering, procuring, and distributing such products to the sites—and that Turley used them.

Moreover, the fact that Familian was not the only supplier of asbestos-containing gaskets does not warrant the conclusion that Turley did not establish exposure. Indeed, the asbestos supplier in *Webb* was not the exclusive supplier of crocidolite asbestos to Johns-Manville; rather, the evidence at trial was that "Special Electric . . . acting as a broker for a mine in South Africa, was one of several suppliers of bags of crocidolite asbestos fiber to Johns-Manville." (See *Webb v. Special Electric Co. Inc.* (2013) 214 Cal.App.4th 595, 625, italics omitted (dis. opn. of Rothschild, J.), review granted June 12, 2013.) In sum, there is no requirement that plaintiffs show that Familian was the exclusive, or even the primary, supplier of asbestos-containing gaskets to PG&E.

Scott's declaration, not to mention his deposition testimony, was sufficient to demonstrate triable issues of material fact as to Turley's exposure to Familian's asbestos-containing products. But the trial court held that conflicts between Scott's declaration and his deposition required it to disregard Scott's declaration. This, too, was error.

### Disregarding Scott's Testimony Was Error

*D'Amico*

As quoted, in support of its conclusion to disregard Scott's testimony the court cited to *Visueta v. General Motors Corp.*, *supra*, 234 Cal.App.3d 1609 and *Scalf v. D.B. Log Homes, Inc.*, *supra,* 128 Cal.App.4th 1510 (*Scalf*). Both cases discuss the rule derived from the seminal case of *D'Amico, supra,* 11 Cal.3d 1, which held as follows: " '[w]here . . . there is a clear and unequivocal admission by the plaintiff, himself, in his deposition' " and the plaintiff contradicts that admission in a subsequent declaration, " 'we are forced to conclude there is no *substantial* evidence of the existence of a triable issue of fact.' " (*Id.* at p. 21, quoting *King v. Andersen* (1966) 242 Cal.App.2d 606, 610 (hereafter, the *D'Amico* rule).) As *Scalf* put it, "In a nutshell, the [*D'Amico*] rule bars a

13

party opposing summary judgment from filing a declaration that purports to impeach his or her own prior sworn testimony." (*Scalf* at p. 1522.)

*Visueta* and *Scalf* are manifestations of the classic *D'Amico* situation: a party takes a position under oath in discovery; the opponent moves for summary judgment; and in opposition the party files a declaration that conflicts with its earlier testimony. In that situation, courts have held that the court may disregard the declaration. The *D'Amico* rule, we conclude, does not apply here.

To begin with, the setting here is not that in *D'Amico* and its progeny—discovery followed by declaration. As plaintiffs put it, the situation here is "precisely the reverse: Paul Scott signed a declaration that was submitted in opposition to Familian's motion for summary judgment *first* and only *then* was his deposition taken. Thus, the declaration, when submitted, did not contradict any prior discovery admissions and *D'Amico* does not apply." Plaintiffs argue for some eight pages why this is significant, why it violates due process, beginning as follows: "Case law has developed two interlocking due process principles which are triggered in this case. The first is the rule that evidence cannot be submitted in reply on a summary judgment motion and the second is that if the evidence is not cited in the moving defendant's separate statement, it does not exist and the moving party cannot rely on it to support its motion." Plaintiffs go on to argue that "[h]ad Scott's deposition been taken and the very same references as relied on by the trial court to grant summary judgment been cited in the separate statement, plaintiffs would have had an opportunity to address the issues. First, plaintiffs could have cited to the evidence in the deposition that conforms to Scott's declaration testimony to show that the evidence was sufficient to establish '*that defendant's product was definitely at his work site and that it was sufficiently prevalent to warrant an inference that plaintiff was exposed to it . . . .*' during his work there. Furthermore, had Familian made the arguments in its moving papers that it made in its reply, plaintiffs would have had the opportunity to brief the issue for the trial court in order to correct its misunderstanding of the evidentiary requirements for establishing exposure, as discussed above. Because Scott's deposition evidence came in at the reply stage, however, plaintiffs did not have the opportunity to do

14

that and, as a consequence, lost their due process right to correct the trial court's misunderstanding of the standards that apply, resulting in the grant of summary judgment and rendering plaintiffs unable to pursue their claims against Familian."

Familian's brief does not even mention, let alone respond to, this argument. But assuming without deciding that the sequence of events does not matter, and that the *D'Amico* rule could pertain, we conclude it was error to apply it here—no matter what standard of review we apply.

As quoted, in *D'Amico* the Supreme Court held that the court could disregard the later-prepared declaration that contradicted a " 'clear and unequivocal admission.' " (*D'Amico*, *supra*, 11 Cal.3d at p. 21.) *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, disapproved on other grounds in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, discussed the *D'Amico* rule, and ultimately followed its holding. But it did so with cautionary language, noting that "an uncritical application of the *D'Amico* decision can lead to anomalous results, inconsistent with the general principles of summary judgment law. We do not interpret [*D'Amico*], however, as saying that admissions should be shielded from careful examination in light of the entire record. A summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence." (*Price v. Wells Fargo Bank, supra*, at p. 482.)

So, applying *D'Amico* properly, courts have held that the court may exclude the evidence where the declaration and the discovery responses are "contradictory and mutually exclusive." (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 862–863.) Or "diametrically opposed." (*Gray v. Reeves* (1977) 76 Cal.App.3d 567, 574.) Or in conflict. (*Scalf, supra*, 128 Cal.App.4th at pp. 1522–1523.) Or where the declaration contradicts "unequivocal admissions" in discovery. (*Mikialian v. City of Los Angeles* (1978) 79 Cal.App.3d 150, 162.) None of those descriptions applies here.

15

To recap, as quoted above, the trial court determined that "[u]pon consideration of the Scott deposition excerpts, the court finds that Scott's testimony conclusively negates his declaration's statements that Familian supplied asbestos laden gaskets and packing that plaintiff Turley was exposed to. Indeed, the deposition demonstrates that, contrary to his declaration, Mr. Scott can only speculate as to whether any particular gasket or packing material Mr. Turley was exposed to, was supplied by Familian or that any said gasket or packing material contained asbestos." And, the trial court concluded, the "only basis for knowledge of asbestos is PG&E codes and vendor numbers."

The trial court's reliance on the few portions from Scott's deposition testimony it cited was wrong, as its summary of Scott's testimony was neither accurate nor complete. Further, the court's demand for such specifics is contrary to law.

Many of the citations by the trial court are used in a misleadingly incomplete way. For example, Scott testified that when he was ordering gaskets, he knew they were asbestos-containing based on PG&E's codes and other vendor numbers. The trial court does not explain why Scott's knowledge of the asbestos content derived from such sources is in any way infirm. Beyond that, the trial court ignored that Scott also testified that the PG&E codes were necessarily based on content, because certain applications required asbestos-containing gaskets, and that failure to use the correct type of product could be dangerous. The trial court also ignored that Scott never testified that the PG&E codes or the vendor numbers were the *only* way he knew about the asbestos content of the products. Rather, he testified that in addition he knew which gaskets supplied by Familian contained asbestos from the statements on the packing slips and invoices.

Scott's testimony also included his response how it was he could testify about the use of asbestos-containing gaskets supplied by Familian during 1983 to 1987 at the compressor stations where Turley was present during gasket changes. His answer: "When, as I've stated and testified before, when those products came in, it was my job to know that that was the right product. It had tags on it, the packing slip. And on that

16

packing slip, it listed the material, what it was. It also had the vendor name on it and Familian's name was on those packing slips." Further, Scott confirmed that it was his job to know who supplied the materials that the mechanic used—indeed, that he specifically had to keep track of which gaskets were asbestos-containing and which were not, because using non-asbestos gaskets in the high-temperature or high-pressure valves was dangerous.

Similarly, when asked how he could testify without speculating that Turley was in "the presence of other mechanics working with asbestos gaskets or packing supplied by Familian," Scott answered that he "observed Mr. Turley in close proximity to different mechanics while working on these gaskets, taking them off and putting them on." He also confirmed that "I've even seen Mr. Turley go in, pull a gasket and bring it out to the mechanic . . . ." And finally, that "I was a natural gas transmission mechanic, journeyman, and an apprentice. I actually used those gaskets myself. I was with those mechanics when they actually went into the warehouse, pulled a gasket out and used it on the job. I had personal knowledge and personal vision, if you will, of them doing this."

To sum up, there was no direct contradiction between Scott's declaration and his deposition testimony with respect to several areas, including: (1) the process and procedures for ordering, procuring, distributing, and using gaskets as part of his job as warehouseman; (2) his personal observations as to Turley's presence at the compressor stations in the immediate vicinity of mechanics replacing valve gaskets on high-pressure and/or high-temperature pipelines (which needed asbestos-containing gaskets); and (3) his personal knowledge about: (a) what types of gaskets, asbestos or non-asbestos, he ordered and obtained from Familian; (b) how frequently he obtained and distributed Familian-supplied asbestos-containing products, and for which applications; and (c) how those products were used. In light of the above, to refuse Scott's testimony under the *D'Amico* rule was error.

As the leading practical treatise puts it, for the evidence to be rejected under *D'Amico*, the "[c]ontradiction must be clear and unambiguous." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2017), ¶ 10:156:10,

17

p. 10-65.) That is not the setting here. Finally, we note again that to the extent Scott's testimony was ambiguous—and we do not conclude it was—summary judgment had to be denied: " 'the task of disambiguating ambiguous utterances is for trial, not for summary judgment.' " (*Reid v. Google, Inc.*, *supra*, 50 Cal.4th at p. 541.)

Moreover, the court's apparent belief that summary judgment was appropriate because Scott could not testify to directly observing any specific incident where he personally witnessed Turley removing what Scott personally knew to be a Familian-supplied asbestos-containing gasket or packing was legally wrong. As shown above, to establish exposure in an asbestos case a plaintiff has no obligation to prove a specific exposure to a specific product on a specific date or time. Rather, it is sufficient to establish "that defendant's product was definitely at his work site and that it was sufficiently prevalent to warrant an inference that plaintiff was exposed to it" during his work there. (*Lineaweaver, supra*, 31 Cal.App.4th at p. 1420.) Scott's testimony established that Familian-supplied asbestos-containing gaskets were frequently used on the many high-pressure and/or high-temperature valves at the two compressor stations supervised by Turley, and that Turley was commonly present when the work of replacing the asbestos-containing valves was being done. That testimony created triable issues of material fact of exposure.

Familian relies on two cases from this District it claims support the summary judgment here: *McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, and *Dumin v. Owens-Corning Fiberglas Corp*. (1994) 28 Cal.App.4th 650. Neither does. *McGonnell* affirmed a summary judgment because the deposition excerpt by declarant plaintiff showed he had no knowledge of any exposure to defendants' products, let alone that any of its products contained asbestos. As our colleagues described it: "All that exists in this case is speculation that at some time [plaintiff] might have cut into a wall that might have contained Kaiser joint compound that might have contained asbestos." (*McGonnell v. Kaiser Gypsum Co., supra*, at p. 1105.) That hardly describes Scott's testimony here.

18

*Dumin*, which Familian describes as "similar" to the case here, is not. The Court of Appeal affirmed a directed verdict, finding insufficient evidence of exposure. And properly so, as the evidence was not only uncertain as to the date defendant's products were present at the shipyard, but plaintiff also failed to show that the product was a dominant one among many used at the shipyard—or indeed, that defendant's product was even among those supplied to the ship. (*Dumin v. Owens-Corning Fiberglas Corp., supra,* 28 Cal.App.4th at pp. 655–656.) This, the court held, would require "a stream of conjecture and surmise." (*Id*. at p. 656.) No such stream is necessary here.

*Lineaweaver* and *Webb* deal with the issue of substantial evidence following trial. A fortiori does the law from those cases apply to summary judgment, where the issue is whether there is a triable issue of fact. Or, as *Rutherford* noted in its criticism of *Pereira v. Dow Chemical Co*. (1982) 129 Cal.App.3d 865: "Several concerns immediately come to mind regarding the soundness of the underpinnings of the holding in *Pereira*. First, the case arose on a summary judgment motion; hence plaintiff need only have shown a reasonable *possibility* that the defendants' chemical products cumulatively contributed to his kidney failure, according to his alternative theory of liability in the case. (*Pereira, supra*, 129 Cal.App.3d at p. 872.)"[5] (*Rutherford, supra*, 16 Cal.4th at p. 981.)

In ruling on a motion for summary judgment, the court must "consider all of the evidence" and all of the "inferences" reasonably drawn thrererfrom (Code Civ. Proc., § 437c (c)) and must view the evidence and inferences "in the light most favorable to the

opposing party." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843.) That evidence demonstrates the summary judgment here was wrong.

---

[5] In light of our conclusion, we need not reach plaintiffs' argument that the *D'Amico* rule applies only as to the testimony of a party not, as here, a third party witness. (Compare *Scalf, supra*, 128 Cal.App.4th at pp. 1521–1523 ["[p]roperly applied, *D'Amico* is limited to instances where 'credible [discovery] admissions . . . [are] contradicted *only* by self-serving declarations of a party."]; and *Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441.)

**DISPOSITION**

The summary judgment is reversed.  Plaintiffs shall recover their costs on appeal.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Miller, J.

A149752*; Turley et al. v. Familian Corp.*

21

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Brad Seligman

Counsel:

Pond North, Frank Dennis Pond, Jennifer Cari Rasmussen, Ann I. Park, Previn A. Wick, Brian Harold Buddell and Michelle P. Tran for Defendant and Respondent.

Arkin Law Firm, Sharon Joellen Arkin; Keller, Fishback & Jackson, Stephen Michael Fishback and J. Bruce Jackson for Plaintiffs and Appellants.